**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**
**COLUMBUS OFFICE**

| | | |
|---|---|---|
| N.R., | : | **CASE NO. 2:25-cv-486** |
| c/o Kircher Law LLC | : | |
| 312 Walnut St., Suite 1600 | : | **JUDGE MARBLEY** |
| Cincinnati, OH 45202 | : | **MAGISTRATE JUDGE DEAVERS** |
| | : | |
| Plaintiff, | : | **COMPLAINT WITH JURY DEMAND** |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SOUTHFIELD HOTEL, LLC | : | |
| dba Red Roof Inn of Southfield, | : | |
| Michigan, Loc #133 | : | |
| 27500 Northwestern Highway | : | |
| Southfield, MI 48034 | : | |
| | : | |
| and | : | |
| | : | |
| RED ROOF INNS, INC. | : | |
| c/o Corporate Service Company, | : | |
| Registered Agent | : | |
| 50 W. Broad Street, Ste. 1330 | : | |
| Columbus, OH 43215 | : | |
| | : | |
| and | : | |
| | : | |
| RED ROOF FRANCHISING, LLC | : | |
| c/o Corporate Service Company, | : | |
| Registered Agent | : | |
| 50 W. Broad Street, Ste. 1330 | : | |
| Columbus, OH 43215 | : | |
| | : | |
| and | : | |
| | : | |
| RRF HOLDING COMPANY, LLC | : | |
| c/o Corporate Service Company, | : | |
| Registered Agent | : | |
| 50 W. Broad Street, Ste. 1330 | : | |

1

Columbus, OH 43215       :

      :

and       :

      :

SOUTHFIELD HOTEL REAL       :
    ESTATE, LLC       :
dba Quality Inn Southfield       :
c/o Statutory Agent Reed Petros       :
P.O. Box 237       :
Belleville, Michigan 48112       :

      :

and       :

      :

CHOICE HOTELS INTERNATIONAL   :
    INC., dba Quality Inn           :
915 Meeting Street       :
North Bethesda, Maryland 20852       :

      :

and       :

      :

KIWI HOSPITALITY DETROIT, LLC   :
Dba Best Western Premier Southfield       :
c/o Statutory Agent Rakesh Sharma       :
26555 Telegraph Road       :
Southfield, Michigan 48033       :

      :

and       :

      :

BEST WESTERN INTERNATIONAL,      :
    INC.       :
6201 N. 24th Parkway       :
Phoenix, Arizona 85016       :

      :

            Defendants.       :

      :

2

NOW COMES Plaintiff, proceeding pseudonymously,[1] by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

### **INTRODUCTION**

1.      Human trafficking, including of children, is the world's fastest growing crime.[2] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[3]

2.      Plaintiff is a survivor of childhood sexual abuse, assault, exploitation and trafficking which was able to be committed hundreds of times over a period of less than two years on the premises of Detroit-area hotels (hereinafter collectively referred to as "Defendant Hotels"), due to and enabled by the willful blindness of those hotels to the criminal misconduct occurring on their properties, their failure to have adequate, if any, security, staffing, or supervision, and/or other misconduct and failures described herein, in violation of the federal Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §1591, 1595.

3.      Plaintiff brings this action against the named Defendant Hotels, all of whom enabled, empowered, harbored, held, facilitated, benefitted from financially or otherwise, and/or any combination of the foregoing, the child sex trafficking venture in which she was sexually

---

[1] For purposes of this action, Plaintiff files under the "N.R." pseudonym because of the legitimate fear of continued reprisal and threats to her safety and the extremely graphic, personally devastating and deeply embarrassing aspects of the childhood sexual abuse, assault and trafficking.  Concurrent with the filing of this complaint is Plaintiff's motion to keep her identity protected with a confidential reference list to be provided to the Court and defense counsel under seal.

[2] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD, (May 22, 2017) https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking. (last visited 1/17/2021).

[3] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm. (last visited 1/17/2021).

assaulted, trafficked for sex, sexually exploited, and victimized in violation of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1591, 1595.

4. As described herein, these entities each had the opportunity and responsibility to prevent, identify, report and/or stop the child sex trafficking of Plaintiff. However, Defendant Hotels turned a blind eye to what was happening to increase, protect and/or save the entities' profit margins and/or financial interests.

## JURISDICTION AND VENUE

5. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000). Furthermore,, this Court has personal jurisdiction over the Defendants pursuant to the Child Abuse Victim Rights Act ("CAVRA"), 18 U.S.C. § 2255, which authorizes a plaintiff to bring a lawsuit in any appropriate United States District Court.

6. Venue is proper in this district because all Defendants are considered residents of the Southern District of Ohio for venue purposes, given the personal jurisdiction granted by CAVRA. *See, e.g., In Re: Hotel TVPRA Litigation,* 2023 U.S. Dist. LEXIS 72454 (S.D. OH) at *33.

## THE PARTIES

**I.    PLAINTIFF**

7. Plaintiff is an adult female born in year 2004 who, as a minor, was a "victim" of child sex trafficking as protected under applicable provisions of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1591, 1595 ("TVPRA").

8. At all times relevant, Plaintiff was a resident of the State of Ohio who was transported to Michigan where she was sexually assaulted, trafficked for sex, sexually exploited, and victimized.[4]

## II. DEFENDANTS

9. The Defendants, collectively, are referred to herein as "the Hotel Defendants."

10. Whenever reference is made in this Complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of said Defendant.

### A. Red Roof Inn

11. "Red Roof Inns" is one of the largest hotel brands in the world.

12. Since opening the first Red Roof Inn in Franklin County, Ohio in 1973, the economy hotel chain, also headquartered in Franklin County, Ohio, has over 600 branded U.S. properties, primarily in the Midwest, Southern, and Eastern U.S.

13. Red Roof Inn® is a Red Roof Inns, Inc, ("RRI") brand property.

14. Defendant Red Roof Inns, Inc. ("RRI") is a Delaware privately held company providing hotel services, with its headquarters in Franklin County, Ohio.

15. Defendant Red Roof Franchising, LLC ("RRF") is a Delaware limited liability company headquartered in Franklin County, Ohio.

16. Defendant RRF Holding Company, LLC ("RRFHC") is a Delaware limited liability company headquartered in Franklin County, Ohio.

---

[4] Again, due to legitimate fear of continued reprisal and threats to her safety, Plaintiff's address will be included in the confidential reference list provided to Defendants and to the Court under seal.

17.     Defendant Red Roof Franchising, LLC's parent company is Defendant RRF Holding Company, LLC.

18.     Defendant RRF Holding Company, LLC's parent company is Defendant Red Roof Inns, Inc.

19.     Defendant Southfield Hotel, LLC d/b/a Red Roof Inn is a Michigan limited liability company with its principal place of business located at 27660 Northwestern Service Drive, Southfield, Michigan.

20.     At all times relevant, Defendant Southfield Hotel, LLC d/b/a Red Roof Inn owned, managed, supervised, staffed, operated, oversaw, controlled the operations of, and/or was inextricably connected to the renting of rooms for which they received financial compensation for the Red Roof branded hotel located at 27660 Northwestern Service Drive, Southfield, Michigan where, as a minor, Plaintiff was sexually assaulted, trafficked for sex, sexually exploited, and victimized in violation of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1591, 1595.

21.     Defendants RRI, RRF and RRFHC control the conduct and operations of their franchisees, such as Defendant Southfield Hotel, LLC, to such an extent that they are liable for the trafficking occurring on franchisee properties.

**B.  Quality Inn**

22.     Quality Inn is an American multinational chain of hotels based in North Bethesda, Maryland. It is a subsidiary of Choice Hotels which has operations in more than 40 countries.

23.     Quality Inn is the founding brand of Choice Hotels International with more than 1,800 hotels worldwide, as of 2018.

24. Choice Hotels International, Inc. is the national franchisor for Quality Inn properties.

25. At all times relevant, Southfield Hotel Real Estate, LLC, a Michigan limited liability company, dba Quality Inn Southfield, owned, managed, supervised, staffed, operated, oversaw, controlled the operations of, and/or was inextricably connected to the renting of rooms for which they received financial compensation for the Quality Inn branded hotel located at 26111 Telegraph  Road, Southfield, Michigan where, as a minor, Plaintiff was sexually assaulted, trafficked for sex, sexually exploited, and victimized in violation of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1591, 1595.

26. Defendant Choice Hotels International, Inc. controls the conduct and operations of its franchisees, such as Defendant Southfield Hotel Real Estate, LLC, to such an extent that it is liable for the trafficking occurring on franchisee properties.

### C. Best Western

27. Best Western International, Inc. owns the Best Western Hotels & Resorts brand, which it licenses to over 4,700 hotels worldwide. The franchise, with its corporate headquarters in Phoenix, Arizona, includes more than 2,000 hotels in North America.

28. One such franchisee is Kiwi Hospitality Detroit, LLC.

29. At all times relevant, Kiwi Hospitality Detroit, LLC, a Michigan limited liability company, dba Best Western Premier Southfield, owned, managed, supervised, staffed, operated, oversaw, controlled the operations of, and/or was inextricably connected to the renting of rooms for which they received financial compensation for the Best Western branded hotel located at 26555 Telegraph  Road, Southfield, Michigan where, as a minor, Plaintiff was sexually assaulted,

trafficked for sex, sexually exploited, and victimized in violation of the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1591, 1595.

30.     Defendant Best Western International, Inc. controls the conduct and operations of its franchisees, such as Kiwi Hospitality Detroit, LLC, to such an extent that it is liable for the trafficking occurring on franchisee properties.

## ALLEGATIONS

31.     Plaintiff incorporates the preceding paragraphs of her complaint as if fully restated herein.

## I.     THE CHILDHOOD SEXUAL ABUSE, ASSAULT, EXPLOITATION AND TRAFFICKING OF MINOR N.R.

32.     Plaintiff's relationship as a minor with her mother was strained. Plaintiff was raised primarily by her grandmother. She had little to no relationship with her biological father.

33.     In 2020, Plaintiff sought to run away from home and was placed under the supervision of Juvenile Court for supportive services.

34.     Unfortunately, an adult male named Derrick Murphy identified Plaintiff's vulnerabilities, snatched her off the streets, and exploited Plaintiff for his personal financial benefit.

35.     Murphy beat Plaintiff, demanded videos of her victimization, and imposed quotas for her to fulfill through commercial sex acts with adult men.

36.     Throughout much of 2020 and 2021, Plaintiff was trafficked more than 400 times at the Defendant Hotels, often residing for weeks at a time at Defendants' premises.

37.     During her stays at the Defendant Hotels, Plaintiff, who appeared to obviously be a minor and unaccompanied most of the time, frequently interacted with hotel front desk staff,

8

management personnel and cleaning employees, and was subjected to adult males coming into and out of her hotel room several times a day, all within the casual observation of hotel staff.

38. Murphy was eventually arrested and successfully prosecuted in the U.S. District Court for the Northern District of Ohio, Case No. 3:23-cr-209 and is serving a term of incarceration of 140 months.

## II. THE SEX TRAFFICKING INDUSTRY

39. At least since the beginning of this century, the pervasiveness of human trafficking, the means to prevent its scourge, and the need to punish its perpetrators have been widely known.

40. For example, at the General Assembly of the United Nations ("UN") convened in New York, New York, in November 2000, and adopted the Palermo Protocol to prevent, suppress, and punish trafficking.[5]

41. Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[6] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[7]

42. A scholarly article published in 2015, estimated that pimps could earn $25,000.00 to $33,000.00 per week selling sex in the Atlanta, Georgia area.[8] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in

---

[5] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.

[6] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf. (last accessed 1/17/2021).
[7] *Id.* at 15.
[8] Sarkisian, *supra* n.4, at 4.

roughly the same time period.  For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clicks and calls or texts from twenty-seven (27) men expressing interest - in a span of just ninety (90) minutes.[9]

43.     In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[10]

44.     The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[11]  In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total 439 human traffickers (inclusive of labor trafficking).[12]

45.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity.  It ought to concern every community, because it tears at our social fabric.  It ought to concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[13]

## III.     THE ROLE & RESPONSIBILITY OF DEFENDANT HOTELS

### A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE NATIONAL SEX TRAFFICKING EPIDEMIC

---

[9] *Id*. at 5.
[10] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf. (last accessed 1/17/2021).
[11] *Id.* at 389.
[12] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf. (last accessed 1/17/2021).
[13] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative. (last accessed 1/17/2021).

46.     The role of the hospitality industry in either facilitating or preventing human trafficking has been widely established and known for years. The hospitality industry plays a crucial role in the sex trade.[14] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

47.     In this regard, End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[15]

48.     The Code identifies the following six steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

49.     Despite efforts by the UN, the White House, and non-governmental organizations to promote policies and procedures to prevent human trafficking, a 2012 report nevertheless

---

[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3. (last accessed 1/17/2021).
[15] https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/150639176174 7/NoVacany_Report.pdf (last accessed 1/17/2021).

revealed that sixty-three percent (63%) of human trafficking incidents occur in hotels.[16] According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[17] At the time the referenced report issued, the hospitality industry had been on notice of the prevalence of human trafficking for the entirety of the twenty-first century, but had done little to nothing to prevent the ongoing occurrences of human trafficking in hotels in the preceding twelve (12) years.

50.    In 2014, ninety-two percent (92%) of the calls the National Human Trafficking Hotline received from hotels reported sex trafficking and two percent (2%) of the calls it received reported some combination of sex trafficking and labor trafficking.[18]

51.    Despite the efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole has continued to lag behind in its efforts to prevent human trafficking.  A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[19]

52.    Even estimates by attorneys *for* the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[20]  The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[21]

---

[16] Sarkisian, M., *Adopting The Code: Human Trafficking And The Hospitality Industry*, 15 CHR 15 (2015), at 3, *available at* https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs. (last accessed 1/17/2021).

[17] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics (last accessed 1/17/2021).

[18] *Id.*

[19] Sarkisian, *supra* n.4.

[20] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last accessed 1/17/2021).

[21] U.S. Dep't of State, *supra* n.10, at 387.

53.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[22] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

54.     This complacency of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue.  Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains - they know it is unlikely that they will be disturbed.

55.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

56.     These hotel employees are uniquely situated to identify and report suspicious activity on hotel property.  From check-in to check-out there are numerous indicators that traffickers and the adults and children who are victimized by sex trafficking exhibit during their stay at a hotel property.  With proper training and other reasonable security measures, hotel owners and operators could prevent the trafficking of persons on their properties.

57.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual

---

[22] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last accessed 1/17/2021).

exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry...and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[23]

58.     Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

59.     A successful trafficking protocol should start with a hotel's front desk staff.  A hotel's front desk is first in line to spot warning signs of human trafficking. A successful trafficking protocol also requires hotels make available throughout the facility, information for victims of human trafficking on how to seek help.

60.     Signs of sex trafficking, including child sex trafficking at a hotel may include, but are certainly not limited to:

 a)  Minor girls or girls appearing to be minors accompanied by older men,
 b)  guests with minimal luggage or clothing,
 c)  rooms paid for in cash,
 d)  lack of identification,
 e)  patrons not forthcoming about full names, home address, or vehicle information when registering;
 f)  room or rooms are rented hourly, less than a day, or for long-term stay that does not appear normal;
 g)  guests dressed inappropriately, including for their age,
 h)  few or no personal possession carried in;
 i)  an excess of condoms in rooms,
 j)  rentals of pornography when children are staying in the room;
 k)  individuals carrying or flashing large amounts of cash,
 l)  renting two rooms next door to each other,
 m)  declining room service for several consecutive days,
 n)  significant foot traffic in and out of rooms,

---

[23] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3. (last accessed 1/17/2021).

o)  men traveling with multiple women who appear unrelated,

p)  guests checking in with little or no luggage,

q)  guests using multiple cell phones and credit cards,

r)  multiple requests for towels,

s)  hotel guests who prevent another individual from speaking for themselves,

t)  hotel guests unable to verify what city they came from,

u)  hotel guests who are distrustful of security, and may be acting as if they are being watched,

v)  hotel guests not in possession of their own identification,

w)  "Friends" or "relatives" of a guest visiting room who are unable to provide their name or other identifying information,

x)  Excessive noise from guests or guest rooms,

y)  or a guest controlling another's identification documents.

61.  The Department of Homeland Security ("DHS") identifies a number of warning signs that indicate the presence of human trafficking at hotels.  According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises such as:

a)  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b)  persons who lack freedom of movement or are constantly monitored;

c)  persons who have no control over or possession of money or ID;

d)  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e)  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f)  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g)  extended stay with few or no personal possessions in the room;

h)  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion);

i)  the same person reserves multiple rooms;

j)  a room is rented hourly, less than a day, or for an atypical extended stay;

k)  attempts to sell items to or beg from patrons or staff;

l)  cars in the parking lot regularly parked backward, so the license plates are not visible;

m)  loitering and solicitation of male patrons;

n)  waiting at a table or bar and picked up by a male (trafficker or customer);

o)  persons asking staff or patrons for food or money; and

15

p) persons taking cash or receipts left on tables.[24]

62. Hotel staff who have undergone training are more aware of human trafficking and can at best prevent it from happening or at worst, are more willing to report it when it happens, than hotel staff who have not been trained.

63. Hotels and hotel brands can and should adopt policies and procedures related to human trafficking and make anti human trafficking resources readily available to employees.

64. Hotels and hotel brands can and should mandate that all staff working at all hotel properties complete anti-human trafficking training.

65. Hotels and hotel brands can and should encourage staff to report suspected incidents of human trafficking when observed on hotel properties.

66. Hotels and hotel brands can and should develop and maintain relationships with law enforcement regarding appropriate and timely responses to suspected incidents of human trafficking on hotel properties.

67. Hotels and hotel brands can and should post anti human trafficking awareness and informational materials in common areas and guest rooms to help eliminate human trafficking.

68. Similarly, hotels and hotel brands can and should develop and maintain relationships with non-profit service providers in the field regarding appropriate human trafficking prevention training for hotel staff.

69. The indicia of human trafficking and effective preventative measures are widely known and available to the hospitality industry and hotels. Hotel brands that do not identify and report evidence of human trafficking on hotel properties do so in spite of the knowledge of that

---

[24] U.S. Dep't of Homeland Security, *Human Trafficking and the Hotel Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last accessed 1/17/2021).

16

preventative training and resources are available, but they simply elect not to engage in preventative policies and practices.

70. The motivation for this ongoing willful blindness and ongoing failure to act within the hospitality industry is plain and simple—corporate greed. Hotels and hotel brands, knowing both the obvious dangers and the remedial safety precautions associated with human trafficking, nevertheless ignored both the signs of and solutions to human trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

71. Prior to, during, and following these incidents involving Plaintiff, the Defendant Hotels also had actual and/or constructive notice of sex trafficking occurring at their properties, as well as prostitution, drug dealing, other crimes and/or general safety concerns from numerous reported incidents made to and recorded by police, video surveillance, and/or oral or written complaints regarding said suspicious activity. Yet the Defendant Hotels failed to take any effective actions to curtail these activities and take necessary action to prevent sex trafficking, including of children, at their hotels.

72. Additionally, the Hotel Defendants had also been aware of sex trafficking occurring at their motel through online complaints and/or review websites showing the pervasiveness of customer reported sex trafficking and/or other crimes at their motels.

73. The Hotel Defendants knew or should have known that their motels had high incident rates of crime and were prone to sex trafficking activity on and/or around the motel premises, including when Plaintiff was trafficked as a minor.

74. The Hotel Defendants failed to implement and enforce any policies or procedures to protect Plaintiff from being sex trafficked.

75. The Hotel Defendants also breached their duties in the following ways:

17

a) did not adequately distribute information to assist employees in identifying human trafficking;

b) failed to provide a process for escalating human trafficking concerns;

c) failed to mandate that all managers, employees, and owners attend training related to human trafficking;

d) failed to provide new hire orientation material/information on human rights and corporate responsibility;

e) failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

f) failed to develop, hold, or require ongoing training sessions on human trafficking; and/or

g) failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

76. Instead, for years, the Hotels have demonstrated willful blindness to the sex trafficking at their motel.

77. Plaintiff exhibited many of the characteristics identified in paragraphs 46 and 47 of this Complaint, all in open and obvious observation of hotel staff.

78. As a direct and proximate result of the wrongful practices on the part of the Hotel Defendants, Plaintiff has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and/or will continue to incur lost wages, lost earning capacity and expenses for medical and psychological treatment, therapy and counseling.

18

**FIRST CAUSE OF ACTION**
**(VIOLATION OF THE TVPRA, 18 U.S.C §1591, 1595)**

79.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

80.     Congress passed the Victims of Trafficking and Violence Protection Act in 2000 ("TVPA"). Pub. L. No. 106–386, 114 Stat. 1466 (2000) (codified as amended in Title 22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code). The TVPA has been reauthorized several times in the years since. With the enactment of the TVPA in 2000 and through its subsequent reauthorizations, Congress recognized that human trafficking constitutes "modern-day slavery."[25] In both the text of the TVPA and the associated legislative history, Congress revealed a strong intent to provide a means of recovery for victims of sex trafficking by allowing them to pursue civil actions for human trafficking violations.

81.     The Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. §1591, *et seq.*, criminalizes the sex trafficking of children and the sex trafficking of adults by force, fraud, or coercion. Separately, §1595 of the TVPRA provides victims of sex trafficking with civil remedies against the perpetrators of sex trafficking and also the beneficiaries of sex trafficking. *See* 18 U.S.C. §1595(a).

82.     18 U.S.C. §1595(a) sets forth the standard for civil liability under the TVPRA. That section provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

---

[25] *See* Markup of H.R. 2620 before House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep. Christopher Smith).

83. Under the 2003 version of 18 U.S.C. §1595(a), only those criminally liable under §1591 could be held civilly liable under §1595. However, in 2008, 18 U.S.C. §1595(a) was intentionally amended with substantially different language that created a category of defendants that could be held liable civilly even in the absence of criminal culpability. By amending 18 U.S.C. §595 in 2008, Congress required "whoever," (*i.e.,* all businesses, including those in the hospitality industry, retailers, and churches), to comply with the new law or face new civil liability. This amendment to the country's systemic human trafficking legislation necessitated a paradigm shift in the business and commercial sections which for decades have enabled, empowered, harbored, held, facilitated, benefitted from financially or otherwise, and/or any combination of the foregoing, from sex trafficking, including of children.

84. Under the TVPRA, any individuals and/or entities are civilly liable for a sex trafficking victim's damages if they: (1) knowingly benefitted; (2) from participation in a venture; (3) that they knew or should have known engaged in sex trafficking." 18 U.S.C. §1595(a).

85. Plaintiff is a survivor of sex trafficking within the meaning of 18 U.S.C. §1591 and is entitled to bring a civil action under 18 U.S.C. §1595 against any individual or entity whose violations of the TVPRA proximately caused the Plaintiff to sustain physical and psychological injuries.

86. As such, Plaintiff is entitled to and hereby asserts a TVPRA claim against Defendant Hotels who knowingly benefitted from participation in a venture that they knew or should have known engaged in sex trafficking. Defendant Hotels' acts, omissions, and commissions, taken separately and/or together, outlined herein, constitute a violation of 18 U.S.C. §1595. Specifically, Defendant Hotels had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in sex

20

trafficking in violation of the TVPRA. At all relevant times, Defendant Hotels not only benefitted financially, but participated in, facilitated, and/or harbored the child sex trafficking venture of Plaintiff, by their acts, omissions, and commissions.

87. As a result of the child trafficking and sexual exploitation of Plaintiff, Defendant Hotels knowingly benefited financially and otherwise by their acts, omissions, and commissions including, but not limited to:

a) Profit from renting rooms to those sexually exploiting Plaintiff;

b) Increased profit margins due to lower operation costs by refusing to implement proper training of Defendants' employees and managers regarding the identification of human trafficking and sexual exploitation;

c) Increased profit margins due to lower operation costs by refusing to install proper security devices in the lobby, hallways, and parking lots of Defendants' hotels and properties that would help: (a) deter human trafficking and sexual exploitation, and (b) be used to identify the occurrence of human trafficking and sexual exploitation and alert the proper authorities and/or intervene in an appropriate way;

d) Increased profit margins due to lower operation costs by refusing to install adequate lighting and security cameras to monitor ingress and egress of human traffickers and visitors looking to purchase sex at Defendants' hotels and properties;

e) Increased profit margins due to lower operation costs by refusing to hire qualified security officers who would actively combat human trafficking and sexual exploitation;

f) Increased profit margins due to lower operation costs by refusing to implement proper security measures to prevent and identify human trafficking and sexual exploitation at Defendants' hotels and properties;

g) Increased profit margins as a result of the continued customer loyalty of traffickers and buyers of commercial sex who sought to exploit individuals, like Plaintiff due to Defendants' lack of measures to prevent and identify sexual exploitation and human trafficking. This customer loyalty leads to increased room sales;

h) Benefit of avoiding interference by law enforcement officials and having to spend the time to address and properly solve any incidence or pattern of human trafficking or sexual exploitation at Defendants' hotels or properties. This prevented Defendant Hotels from having to spend the time and money to fill out all proper and necessary

21

law enforcement reports and information, respond to proper and necessary subpoena requests, and cooperate with any inquiry and needs of the prosecution; and/or

i) Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and sexual exploitation or take active security measures to prevent human trafficking or sexual exploitation on their properties.

88.     Defendant Hotels not only knowingly benefited financially from participating in illegal sex trafficking ventures in violation of the TVPRA, 18 U.S.C. §1591(a)(2), by keeping operating costs low (including, but not limited to, saving on overhead costs for adequate security, supervision and/or training), increasing the overall volume of illegal commercial sex at their hotel properties, and maintaining the loyalty of the segment of their customer base that seeks to participate in the demand and supply side of sex trafficking, but Defendant Hotels directly benefitted from the sex trafficking of Plaintiff on each occasion they received payment for rooms, increased brand footing in the industry, or other benefits of value as a result of being harbored at Defendant Hotels.

89.     As a direct result of the wrongful conduct of the Defendant Hotels, Plaintiff has incurred the damages described above.

**SECOND CAUSE OF ACTION**
**(CHILD ABUSE VICTIM RIGHTS ACT, 18 U.S.C. §2255)**

90.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

91.     The Child Abuse Victim Rights Act states in pertinent part as follows:

Any person who, while a minor, was a victim of a violation of section . . . [18 U.S.C. § 1591] . . . and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

22

92.     Plaintiff hereby asserts all rights of 18 U.S.C. § 2255 to which she is entitled as a victim of sex trafficking in violation of the TVPRA 18 U.S.C. § 1591, 1595.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged against Defendants, and that it award damages to her in an amount that is just and fair and in excess of seventy five thousand dollars ($75,000) exclusive of costs and interest, in addition to costs, reasonable attorney fees and other relief authorized by law and which this Honorable Court deems just under the circumstances.

RESPECTFULLY SUBMITTED,

/s/ Konrad Kircher
Konrad Kircher (Ohio Bar 0059249)
KIRCHER LAW, LLC
312 Walnut St., Suite 1600
Cincinnati, OH 45202
PH: (513) 218-1252
Fax: (513) 586-0480
konrad@kircher.law
*Attorney for Plaintiff*

## JURY DEMAND

Now comes Plaintiff, by and through her attorney, and hereby demands a jury trial on all issues triable by right herein.

/s/ Konrad Kircher
Konrad Kircher (Ohio Bar 0059249)

23

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed with the Court through its e-filing system and will be served upon all counsel of record through that system on _____, 2025.

/s/ *Konrad Kircher*
Konrad Kircher (0059249)

24